May it please the Court, I'm Christopher Pousa representing H.J. Heinz. I'd like to reserve five minutes for rebuttal, if I may. The first issue that we've raised on appeal is whether Heinz was obligated, under the COPAC agreement, to purchase sweet potato fries from Bright Harvest for the 2012 crop year and for subsequent crop years. The parties, however, did not agree to a specific quantity. And so that issue turns on whether the COPAC agreement is a requirements contract. A requirements contract is one that includes a term that measures quantity by the requirements of the buyer. And under Idaho law, a term that measures quantity by the buyer's requirements means that the buyer has expressly or implicitly agreed to buy goods from the seller exclusively. And this element of exclusivity is absolutely necessary for a requirements contract. Exclusivity kind of what it does is it provides the reasonable certain basis to actually determine quantity. And it does that because the buyer agrees to buy goods of a particular kind from the seller, and the buyer agrees to purchase those goods only from the seller and from no other seller. The agreement here, this COPAC agreement, is not ambiguous on exclusivity. Heinz did not expressly or implicitly agree to purchase sweet potato fries from Bright Harvest exclusively. And I think the fundamental problem that the district court did was that he allowed implied provisions to contradict and to override express provisions. Under Section 4 of the contract, it expressly provides that Heinz can source sweet potato fries from his own factories or from other sources. So let me just see if I make sure I'm following you. Is it your argument that under Idaho law that was applied here for a requirements contract that all of the product that the buyer requires must be exclusively bought from the seller? I think the case law says, Your Honor, it's all or some. Okay, so you would agree it could be some. It can be some. I think the case law confirms that. Okay. That's with the district court. Yes, and there are cases out there that look at, you know, some. So there was no kind of absolute exclusivity. I think the court kind of the court's view of the exclusivity changed throughout the entire case. This case was tried twice. Did your position change as well throughout the entire case? No. I think our case has always been that there was no. Did Joyce acknowledge that some would be sufficient for exclusivity? I believe so, Your Honor. I mean, because the way we. I'm having trouble. English is my second language. But I don't see how you can have an exclusive contract with requirements of exclusivity if it's only buying some of your requirements. Well, so the case law, Your Honor, has developed such that if there is an agreement to buy some product exclusively from the seller, that that has been sufficient for an exclusive contract. A requirements contract. A requirements contract. A specific amount. Yes, a specific amount. Yes, sir. So, I mean, if I say to you I'd like to buy 100 percent of my needs, that's like absolute exclusivity. However, if I said, you know, I want you to fill 50 percent of my needs and I'm only going to come to you, that is still an exclusive contract under the law. How can that be exclusive? Where is he going to get the other 50 percent? Well, the case law is looking only at that quantity that is expressed in the contract, Your Honor. So, I mean, there are cases that find that that exclusivity means absolute exclusivity. And I think when you look at the leading commentators, what they look at is whether or not there is exclusivity for all or some. That is the issue. And your position is there was no exclusivity here as to up to 10,000 whatever it was? Yes, sir. That is true. And the reason for that is that the parties agreed that this 10,000 pounds, what the contract actually says, I should start with Section 3, which is where the parties set out what's called the supply chain procedures. And it starts that says, Heinz has established a non-binding annual planning target of 10 million pounds. And then it goes on to say that Heinz will provide or deliver purchase orders as here and after provided, and there's a comma, subject to Bright Harvest capacity. I think what the district court got confused by was, one, the reference to the 10 million pounds, and then also the reference to subject to Bright Harvest capacity. And under neither of those did Heinz agree to actually buy the 10 million pounds. It also did not agree to buy Bright Harvest capacity. And when you look at the whole of the contract, the whole of the contract, it confirms that Heinz was not making that type of agreement. What Heinz was agreeing to was to place purchase orders. And the supply chain agreements talk about the fact that Bright Harvest is going to set its capacity, and there's absolutely no promise of capacity to Heinz. I mean, Bright Harvest did not commit any capacity to Heinz. It was just going to inform Heinz on an annual basis what that capacity would be. Heinz would then, in turn, submit these 12- to 18-month rolling forecasts, and those forecasts would eventually kind of roll into an eight-week forecast and then into what they called weekly demand files. And once those weekly demand files hit that fifth week, that is what Heinz agreed to purchase. And so I think the language of the contract is very clear on that. There is absolutely no agreement to purchase Bright Harvest capacity, and there's no agreement to purchase this 10 million, that 10 million pound figure. So the district court said, though, looking at the same contract, that it was ambiguous. And we disagree with that, Your Honor. Because it was ambiguous, it had to go to the jury. Correct. So your argument is it's a matter of on these facts there was only one conclusion. There's only one reading of the contract, Your Honor, under the plain language and reading the contract as a whole. What did the court below find was ambiguous about the contract? So there were two parts that the court found were ambiguous. The first was this reference to Bright Harvest capacity. Again, what the contract says in Section 3, little i, is that Heinz will deliver purchase orders as here and after provided subject to Bright Harvest capacity. What the court believed that seemed to say is that Heinz was going to deliver purchase orders subject to Bright Harvest capacity and completely ignored the reference to the rest of the contract. The other ambiguity that the court found was this reference to the 10 million pounds. And so there is case law that says that if you agree to purchase a stated estimate, that that is sufficient to imply exclusivity for a requirements contract. And for there to be a stated estimate, again, there has to be an agreement to actually buy that number, an approximate number. Mr. Poussa, your first claim of what the district court found was ambiguous was that Bright Harvest under 3, small i, subject to Bright Harvest capacity. How is that ambiguous? Well, the court thought it was ambiguous because it thought that Heinz was required to buy up to Bright Harvest capacity. That's what the court viewed that that contract could be read to mean that Heinz was obligated to buy up to Bright Harvest capacity. And that's just not what it says. All right. I see. I take your, I understand your claim. I don't necessarily take your point. Well, it's, well, I mean, Your Honor, I think the question is, is there only one meaning from this contract? And we believe that the terms are clear that there is only one meaning. Which is? Which is that Heinz was not required to buy any amount of quantity for this 2012 crop year or beyond. And that was the whole issue. Because the parties had this agreement. They operated under it for the 2010 crop year. They operated under it for the 2011 crop year. The question was, did they have to, was Heinz obligated to buy any quantity in the 2012 crop year for the remainder of the contract? That was the issue. The court found that the contract was ambiguous with respect to that. And the reason it found that it was ambiguous is for what we've discussed about the subject to bright harvest capacity and the fact that they thought that there was a stated estimate, which was this 10 million pounds of non-binding annual planning target. And our argument on appeal is that the court erred because the clear language of the contract simply doesn't state that. Heinz did not agree to buy bright harvest capacity. It agreed to provide forecasts, which would eventually roll into five weeks of firm purchase orders. Heinz also did not agree to purchase this 10 million pound non-binding planning target. I mean, the party specifically identified it as non-binding. It was not supposed to be enforceable. You're reading a subject to bright harvest capacity means you'll buy it if they can produce it. No, Your Honor. That was what the trial court held. Our position is, is that our only obligation under the contract was to purchase pursuant to the supply chain procedures, subject to their capacity. And if you look closely at this section 3 little i and 3 little. If they couldn't produce, couldn't you say they were in default? There was no requirement for them to provide a minimum, any minimum capacity, Your Honor. There is no requirement that they provide their capacity to Heinz. And what is the meaning of subject to bright harvest capacity, as you put it? As we put it, it's under the supply chain procedures. So I think these are set out very clearly as far as that bright harvest starts out. It says, this is my capacity for the year. Then Heinz comes out and it says, okay, here's my 12 to 18 month forecast. And those eventually roll into a firm purchase orders. But there's no requirement that Heinz buy any minimum amount. There's no requirement in the contract. And for the only way, the only way for this contract to be enforceable for the 2012 crop year is if it's a requirements contract, which is where we get to exclusivity and stated estimate and these other issues. But didn't they agree that they shall place orders? Subject to, pursuant to the terms of the agreement, Your Honor. It wasn't, they did not say we shall place orders, period. We shall place orders pursuant to the terms of the agreement and specifically to the supply chain procedures. So it wasn't as simple as we're just going to place purchase orders for bright harvest capacity. The parties articulated a very specific process for how purchase orders would be made. And that is what Heinz agreed to. Your reading of this is this was just all, these were estimates. These were, like, best options. These were aspirational goals. That's probably a better way to put it. These are aspirational goals under this agreement. Correct. And we may need up to 10 million pounds, but we may not need anything. Correct. And, again, bright harvest was protected in this because they're the ones that set their own capacity. There was no minimum volume that they guaranteed to Heinz. In addition, there's other provisions of the contract that allow, if Heinz was not going to use up to 10 million pounds, that they could use it themselves. And there's also provisions that if, for some reason, the forecast, Heinz actual orders are below the forecast, that Heinz would be responsible for those, for that extra product. You wanted to save some time for everybody. I do. And just very quickly, we do have an alternative issue on the motion for new trial. And our main argument here, just very quickly, is that the district court erred because he was looking through kind of the wrong lens for what's good faith under a requirement under the UCC. And if he would have used the correct lens, he would have had to consider all the evidence, and that that was abusive discretion. Okay. Thank you. Thank you. We'll hear from Bright Harvest. May it please the Court, Chad Nicholson on behalf of Bright Harvest Sweet Potato Company. As the Court has recognized, I think the fundamental issue here is, is this contract ambiguous? That is the issue that has been appealed. Bright Harvest's position is that the contract, by its own terms, does, in fact, set forth exclusivity. But at the very least, reading the contract in its entirety shows it is ambiguous, and therefore the district court was correct. Mr. Nicholson, you said that the contract does not show exclusivity or does show exclusivity? It does show exclusivity. It's implied in that document, which this Court has recognized is an appropriate way to create exclusivity. Walking through the document itself. Let me jump ahead and then you go back to I. I think that's where you were heading. Even if I implies exclusivity, would you address then for? Certainly. And you know the sentence. Right. What I refer to as the sourcing sentence. The sourcing sentence is there to, and you give meaning to it by the fact that the exclusivity is to Bright Harvest's capacity. There is a recognition that at some point there may be a demand that exceeds their capacity. So in that event, Hines said that it can self-manufacture or go elsewhere. But back to your point, you are correct that our position is there absolutely does have to be orders here. Section 1 of the COPAC agreement expressly states that Hines shall place purchase orders. And it does say under the terms of this agreement, but it expressly says they shall place purchase orders. Similar language is also shown up then in Section 3I as well, where it indicates that the parties intend that Hines will deliver purchase orders. These are not optional language. And the parties demonstrated this. But that shall be bind by the supply chain procedure. And, Your Honor, I believe reading that in context, what that indicates is that when an order is submitted, they will follow that supply chain procedure. But you get to that point after the fundamental question of they've committed that they will, in fact, order from Bright Harvest. With respect to exclusivity, I would again address to the Court several provisions of the contract. On the opening page of the COPAC agreement, it does state the parties' intentions. And what it indicates is that Hines desires to obtain a supply of frozen processed sweet potatoes. The indication here is not multiple supplies, an additional supplier, or another supplier. So Hines is indicating it wants a singular supply, in other words, an exclusive source. When you look at Section 3I, it also indicates that Bright Harvest was required to reserve capacity. What Hines has ignored in its argument and its briefing is that the only circumstance when Bright Harvest was not required to reserve capacity was when a series of events occurred, all of which were within Hines' control. Under Section 3I, Bright Harvest would produce an annual supply plan. Only in the event that Hines' annual run rate did not consume 10 million pounds, or their forecast did not consume 10 million pounds, did Bright Harvest then have the option to use its own capacity. Not Bright Harvest, Hines. Excuse me, Hines. Well, actually, no, Bright Harvest used that 10 million capacity. But before it used that 10 million capacity, it had to notify Hines and give them the 30-day first right of refusal to that capacity. So if Hines didn't use that capacity up, it controlled letting Bright Harvest use that elsewhere. So there's clearly an exclusive portion of Bright Harvest's capacity that will be dedicated to Hines. The termination clause also clearly indicates that there is exclusivity here. This is Section 21, and that clause sets forth three different ways that this contract can be terminated. And bear in mind, Section 2 indicates that this is a six-year contract. The three ways that this can be terminated are through essentially a bankruptcy, a breach of the agreement, or the third is a merger. In this instance, and this is only at the option of Hines, if Bright Harvest becomes a party to a merger such that Bright Harvest is now part of a competitor, then Hines has the option to get out of this contract. That clause only makes sense if Hines is expressly obligated to go to Bright Harvest and purchase exclusively from them 10 million pounds up to Bright Harvest's capacity. That makes sense. Under Hines' reading of this contract, what Section 21 creates is an option to get out of an option to buy. You simply don't need that language there. You just stop buying from them, if that's what this contract was all about. In essence, what Hines has really contended is that this is an option contract. But as I've indicated, that simply does not give meaning to all the terms in the contract, and it creates irreconcilable inconsistencies. Additionally, the past consideration that they submit to the court or identify as creating consideration for that contract is there's been no evidence demonstrated that, one, well, that that is a major inducement to Bright Harvest entering into this contract. And on that point, too, of past consideration, I would just note that even the Idaho Supreme Court case that Hines relies upon clearly indicates that past consideration is consideration for a new contract only in the rarest of circumstances. And that's not the situation that we have here. So in sum, it's our position that the terms of the COPAC agreement do very clearly indicate that exclusivity is present. At the very least, there's an ambiguity, and the district court appropriately let this matter go to the jury. And what do you claim as to what is that ambiguity? Well, the ambiguity, well, I guess, again, to back up, our position is that we think it's unambiguous that there is exclusivity and that they have to purchase from us. Did they have to purchase 10 million pounds? They had to purchase 10 million pounds up to Bright Harvest's capacity to purchase. That's what Section 3. Wait, wait, wait. Say that again. And I think I said purchase. They were obligated to purchase up to 10 million pounds and up to Bright Harvest's capacity to produce. So it could be less. It could be. And part of that is when you understand and you look at the ambiguities here and a question of, well, maybe what does that mean, that's where looking at the circumstances that this was created gives meaning to these terms. This COPAC agreement was created in an environment where Heinz competitors for this particular product were already in the market. Heinz did not have the capacity to produce this at the time. They had no other options to produce this. There was also uncertainty as to what the amount of ultimate product would be needed for these sweet potato fries. That was because sweet potatoes was kind of a new item in the marketplace? It was. This was, you know, obviously several years ago, 2008, 2009. It was kind of the fad at the time, and Heinz wanted to get into the market, but they weren't certain if they would need 10 million pounds or 40 million pounds. But Bright Harvest was positioned to where they could get them into the market very, very quickly. But, again, the parties recognized that this product may exceed Bright Harvest's capacity to produce, particularly the capacity that Bright Harvest was contractually obligated to reserve under 3I. So that's the reason for that amount of approximately 10 million pounds or the estimate of 10 million pounds subject to their capacity to produce. So if Bright Harvest could only produce 8 million pounds, Heinz still had to buy 8 million pounds? Up to 8 million pounds. Well, if Heinz had good faith requirements for 8 million pounds, and that's actually a good transition into where I was going next on the issue with Judge Windmill's. I listened to the judge's question. I don't know if you answered it or segued away. Well, I'm certainly not attempting to segue away, so let me come back to it. If Bright Harvest's capacity to produce was 8 million pounds, but Heinz only needed, say, approximately 4.5 million pounds, then because this was a requirements contract, Heinz was obligated to order and purchase from Bright Harvest 4.5 million pounds, its requirements. And Heinz couldn't say, we need 8 million pounds, but we're only going to buy 4 million pounds and produce 4 million ourselves. Provided that Bright Harvest had the capacity to produce, that is correct. But in the event that Heinz needed 13 million pounds and Bright Harvest had only 8 million pounds of capacity, Heinz was then entitled to produce that excess 5. And what I was trying to transition to and not trying to duck your question was with respect to the grant of the new trial. That's precisely what we have here. And this argument of good faith really confuses the issue. At trial, there was absolutely no dispute that Heinz had requirements for the products subject to this agreement. It was undisputed. The amount was undisputed. There was also no dispute whatsoever that not a single pound of that product was purchased from Bright Harvest. And as you consider this, so what we have is we've found a valid requirements contract that obligates Heinz to purchase its requirements subject to Bright Harvest's capacity to produce. Bright Harvest had been producing approximately 7 to 7.5 million pounds a year. They had the capacity to produce that roughly 4.5 million pounds. There's simply a breach there. The good faith element really- Well, it all relies on the contract being an exclusive contract, therefore a requirements contract, correct? I mean, that's the foundation of your argument. Well, that is one of our arguments. We do believe that including the stated estimate can, under Section 2306 as well, does create a valid and enforceable requirements contract. And when you look at Section 3i of the COPAC agreement, that $10 million non-binding annual planning estimate clearly is an estimate. One of the ways that you know that it's an estimate as well, again, is when you look at the capacity that Bright Harvest is required to reserve. If it's not an estimate, there's simply no reason to tell Bright Harvest to reserve that amount of capacity. But we do believe that that presence of the stated estimate also suffices under Idaho law. What was your position at trial with respect to the amount that they had to buy for the 2012 year? Our position at trial was that they were obligated to purchase from Bright Harvest the amount produced because that was within our capacity. And that goes back to the good faith. It was approximately- The amount produced, which was how much? I apologize. The amount that they required or that they internally produced, which was, I believe, approximately 4.2, 4.5 million pounds. They were required to buy at least that amount. That was the amount that they were required to purchase. And there is not an argument, and I think this is where good faith would come in. The argument is not that, well, Bright Harvest had the capacity to produce 7.5 million, so you had to buy that. There's not a challenge, there's not a dispute that the amount of Heinz requirements was reached in good faith. It's the fact that once they determined what its requirements were, they just simply stopped buying. They said zero. Zero. For 2012, we're just going to produce it ourselves. Correct. In our own plan. Right. And actually, and then throughout the duration of the contract. Okay. And unless there's any other questions, I have nothing further. I don't hear any, so thank you. Thank you. I believe that counsel for Bright Harvest had some additional time. Yes, thank you, Your Honor. The contract simply does not state what Bright Harvest is saying. There are no express terms in the contract that obligated Heinz to purchase any minimum quantity from Bright Harvest, and there's nothing in the contract, there's absolutely nothing in the contract that says that Bright Harvest had to reserve any minimum capacity for Heinz. That is just not what Section 3 of the contract says. And to find, to read the contract as the district court thought it could be read and as Bright Harvest contends means that you're going to have to imply terms that do contradict and override these express terms of the contract. I mean, there is a specific term that allows Heinz to self-produce. There are specific terms that say we're going to follow the supply chain procedures, and that is what Heinz agreed to do. What it wanted here was flexibility, and it wanted flexibility for five years, and that's what it got from this contract. So if you read the provisions of the contract very carefully, it just simply does not say what the district court thought it may say. Do you agree with your friend that you interpret this as an option contract? Yes, Your Honor. I think that was Heinz's belief, that this gave us, it was like a master supply agreement for a term of five years, that we had the option that we could come in and if we needed product, we could get it from Bright Harvest. That was how Heinz viewed the contract. And if you needed product, you wouldn't buy it from anybody else? No. If we needed product, there's a specific provision that says we can self-produce. We can use our own factories. And that was Heinz's primary concern here. So your interpretation of the contract is it's an option contract. You have to buy from Bright Harvest unless you produce it yourself. Yes, Your Honor. If we weren't producing it ourselves, we have that option that if we can fulfill our needs, we're going to go to Bright Harvest. You can't go to Wombat Limited. Well, the contract says, the contract explicitly says that we could produce from our own factories and we could also look to other suppliers. Oh, look to other suppliers. We could. That's what the contract says, Your Honor. So it was a one-way deal. It was. You required them to, what was the consideration for the option? And that was a dispute before the district court, and the district court said past consideration wasn't proper. But the issue at trial was simply, is it a requirements contract or is it not? And that was the issue at trial. And so. Counsel, quickly, just run me through quickly. Yes. I'm looking at the Iowa Code and looking at the comma after good faith. And it says, except that no quantity unreasonably disproportionate to any stated estimate. You know what I'm talking about. Yes, ma'am. Quickly run me through that argument that you made, that under the statute that this is not a requirements contract. Okay, Your Honor. So I think there is some confusion about the statute. The statute does not form a requirements contract. It presumes that you're coming to the table with a requirements contract. And if you come to the table with a requirements contract, which means exclusivity, then you're looking at good faith. So I think the district court got this confused, and many courts do. This does not form a requirements contract. And under Idaho law, it is exclusivity. And so we need an actual agreement that says, Hines is going to purchase goods from Bright Harvest. I understand your argument. Thank you. Yes. Okay. Thank you. I'll let you go over your time. Thank you. Thank you very much for your arguments on both sides. We appreciate your arguments, and we'll submit the matter.
judges: Paez, Bea, Black